# EXHIBIT B

1   James M. Wagstaffe (95535)
    wagstaffe@wvbrlaw.com
2   WAGSTAFFE, VON LOEWENFELDT,
    BUSCH & RADWICK LLP
3   100 Pine Street, Suite 2250
    San Francisco, CA 94111
4   Tel: 415-357-8900
    Fax: 415-357-8910
5

6   *Attorneys for Plaintiffs*
    Additional counsel on signature page.
7

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON        8/4/2022
By        /s/ Una Finau
          **Deputy Clerk**

8                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
9                 **IN AND FOR THE COUNTY OF SAN MATEO**

10  LAURA ASHMAN,                      )   Civil Action No. 22-CIV-03178
                                       )
11                                     )
                 Plaintiff,            )   **COMPLAINT**
12                                     )
                                       )
13      vs.                            )
                                       )
14  INSTAGRAM LLC and META PLATFORMS,  )
    INC., f/k/a FACEBOOK, INC.,        )
15                                     )
                 Defendants.           )
16  _____

17        Laura Ashman ("Plaintiff"), for her Complaint against Instagram LLC and Meta Platforms,

18  Inc. f/k/a Facebook, Inc. (together, "Meta" or "Defendants"), alleges as follows:

19                            **INTRODUCTION**

20        1.      In October 2003, a sophomore at Harvard College named Mark Zuckerberg hacked

21  into the websites of Harvard's residential dorms to collect photos of students.  He then designed a

22  website called "Facemash" that invited users to rank the "hotness" of female students by comparing

23  their photos side-by-side. In just one day, Facemash users cast over 22,000 votes judging the looks

24  of Harvard's student body.  This was precisely the point of Facemash, as its homepage made clear:

25  "Were we let in for our looks? No. Will we be judged on them? Yes."  When interviewed about

26  Facemash, Zuckerberg stated, "I'm a programmer and I'm interested in the algorithms and math

27  behind it." Zuckerberg was summoned to appear before Harvard's disciplinary body but not

28  expelled.

2.      Eighteen years later, Mark Zuckerberg has become one of the richest men in the world, with a reported net worth of approximately $65 billion.  Zuckerberg sits atop the vast fortunes of Meta, the tenth most valuable company in the world.  Not only is Zuckerberg Meta's CEO, he also personally controls a majority of the voting rights of its stock.  In 2021, Meta's income from operations exceeded $46 billion, up 43% from the prior year.  The crown jewel of Meta's product line is Instagram, an application for viewing and sharing photos and videos.  Every month, nearly 2 billion people actively use Instagram—including over 70% of American teens ages 13 to 17.

3.      Zuckerberg's power and fortune have changed exponentially since his Harvard days.  His willingness to exploit others for personal gain has not.  Like Facemash before it, Instagram is designed to capitalize on its users' insecurities—in particular, young people's craving for social acceptance and attention, and their desire to be judged attractive by their peers.  Unlike Facemash, Instagram utilizes complex algorithms and behavioral cues to addict pre-teen and teenage children to maximize their use of the product.  Unlike Facemash, Instagram is no dorm room experiment, and its harmful effects have not been confined to one college campus.

4.      The Instagram business model is straightforward.  Defendants systematically harvest hundreds of data points about Instagram users—including when, where, how, and for how long each individual uses the product; their age, gender, education, job title, city, and community; and their prior purchases, device usage, interests, and hobbies.  Defendants use these data principally in two ways.  First, they let advertisers exploit these data to micro-target ads to specific audiences and even people.  In exchange, advertisers pay Defendants handsomely—over $33 billion in the fourth quarter of 2021 alone.  Second, Defendants use the data to make Instagram as addictive as possible to each of its users.  Defendants leverage a user's data to personalize the product's stream of photos and videos for that user, as well as the content and timing of notifications sent to a user.  The goal is to prompt further "engagement," meaning more views of advertisements and more revenue for Defendants.

5.     Unfortunately, Defendants' engagement-driven business model and Instagram's intentionally addictive product design have created a public health crisis for pre-teen and teenage girls.  Defendants' extraordinary financial success has come at the expense of children's well-being.

6.     In September 2021, the Wall Street Journal began publishing a series of reports based on internal documents leaked by former Facebook product manager Frances Haugen.  The documents are disturbing.  They reveal that, according to Defendants' own researchers, 13.5% of U.K. girls reported more frequent suicidal thoughts after starting to use Instagram, 17% of teen girls reported worsening eating disorders after using Instagram, 32% of teen girls who felt bad about their bodies were made to feel even worse by Instagram, and over 40% of Instagram users who reported feeling "unattractive" said that feeling began while using Instagram.

7.     Internal Meta presentations from 2019 and 2020 were unsparing in their conclusions about the harms caused by Instagram: "We make body image issues worse for one in three teen girls."  "Mental health outcomes related to this can be severe."  "Aspects of Instagram exacerbate each other to create a perfect storm."

8.     Defendants could have and should have redesigned Instagram to limit its use by minors, the demographic most at risk from its faulty design.  Instead, Defendants did the opposite. Prompted by declining "global teen penetration" on Facebook, Defendants turned to Instagram to bolster their relevance with young consumers and beat back competition from TikTok and Snapchat (the latter of which had turned down a $3 billion acquisition offer from Zuckerberg in late 2012). Driven by what they described internally as the "ultimate goal [of] messaging primacy with U.S. tweens," a "valuable but untapped audience," Defendants leaned into Instagram's addictive quality, designing new features to increase pre-teen and teen dependency on the product.  Meanwhile, Defendants buried their researchers' findings and persisted in their efforts to convince the American public that Instagram is safe for kids.

9.     Haugen's revelations make clear that Defendants "engage" children by addicting them to an app that deliberately exploits the neurobiology of their developing brains.  Studies show that, starting around age 10, children's brains undergo a fundamental shift that spurs them to seek social rewards, including attention and approval from their peers.  In addition, the region of the brain that regulates emotion, the prefrontal cortex, does not mature until early adulthood. Instagram takes advantage of this developmental stage in children, and all the insecurities, status anxieties, and beauty comparisons that go with it.  Leading pediatric health experts concur that the resultant harms are widespread, serious, long-term, and in tragic instances even fatal.

10.     Laura Ashman is a 21-year-old resident of Fredericksburg, Virginia.  She first began using Instagram in 2013, when she was 12 or 13 years old.  In keeping with Instagram's goal and design, the frequency and intensity of Laura's usage increased as she started high school, until she was using the product up to 10 hours a day.  Laura's use was so extensive that she would stay awake into the early morning to continue scrolling.  As a result of her addiction to Instagram, Laura started skipping school and avoiding her schoolwork.  When her parents attempted to take her smartphone away from her, Laura would become distraught, leading to fights with her family.  Over time, Laura went from earning straight A's to failing most of her classes, barely earning grades sufficient to graduate from high school.

11.     It was during this period of addiction that Laura started to harm herself.  When she was in the eighth grade, Laura used the razorblade from a pencil sharpener to cut herself.  This self-harming behavior rapidly increased in frequency and severity—and to this day, Laura wears the scars of her self-harm, up and down her arms and legs.  During her freshman year, Laura attempted to take her own life, the first of three such attempts.

12.     Laura's use of Instagram led her to develop a serious eating disorder and depression, in addition to her cutting and suicide attempts.  As a result, Laura has been hospitalized at multiple facilities for emergency mental health interventions, spent three months in residential treatment,

participated in three partial-hospitalization treatment programs, and received care from intensive outpatient treatment programs—all in addition to continuous outpatient psychiatric and psychological treatment, which has included a wide range of medications to manage her symptoms.

13.     Plaintiff brings this lawsuit to hold Defendants to account for knowingly unleashing onto the public a defectively designed product that is addictive, harmful, and at times fatal to children.  Zuckerberg's motto is to "move fast and break things."  As shown below, he and his companies succeeded in breaking this young woman's childhood.

**PARTIES**

14.     Plaintiff Laura Ashman is a citizen and adult resident of Virginia, where she has lived at all relevant times.

15.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, California.  Meta owns and operates the Instagram social media product, which it makes widely available to users throughout the United States through a website and applications for mobile devices.

16.     Defendant Instagram LLC is a Delaware limited liability company with its principal place of business in Menlo Park, California.  Instagram LLC is a wholly owned subsidiary of Meta Platforms, Inc. and, in concert with its corporate parent, operates and makes available to the public the Instagram social media product.

**JURISDICTION AND VENUE**

17.     This Court has subject-matter jurisdiction over this case pursuant to the California Constitution, Article VI, § 10, and is a court of competent jurisdiction to grant the relief requested.

18.     This Court has personal jurisdiction over Defendant Meta Platforms, Inc. because it is headquartered and has its principal place of business in the State of California. This Court has personal jurisdiction over Defendant Instagram LLC because its principal place of business is in the State of California.

19.     Venue is proper in this Court pursuant to California Code of Civil Procedure sections 395 and 395.5.  Defendants Meta Platforms, Inc. and Instagram LLC are headquartered in the County of San Mateo and regularly conduct substantial business here.

## FACTUAL ALLEGATIONS

### Facebook's Acquisition of Instagram

20.     After narrowly escaping expulsion from Harvard, Zuckerberg began writing code for a new website, thefacebook.com.  The growth of the social media product that subsequently became Facebook has been extensively documented and was the subject of an Academy Award-winning film.  By the end of 2005, Facebook had expanded its reach to thousands of colleges and high schools in the United States and abroad.  Over the coming years, Facebook grew well beyond campuses, reaching over 100 million total active users by the fall of 2008.  By February 2011, Facebook had become the largest online photo host, holding nearly 100 billion photos.  And by the end of 2011, Facebook had turned its initial losses into unfathomable profitability, bringing in annual revenues of $3.7 billion and working with an operating income of $1.7 billion.

21.     But Facebook's future success was not guaranteed, and Zuckerberg knew it.  On February 1, 2012, Facebook filed with the Securities and Exchange Commission for an initial public offering.  Facebook's filing noted that the company's historic performance was unlikely to continue indefinitely: "A number of other social networking companies that achieved early popularity have since seen their active user bases or levels of engagement decline, in some cases precipitously. There is no guarantee that we will not experience a similar erosion of our active user base or engagement levels. A decrease in user retention, growth, or engagement could render Facebook less attractive to developers and advertisers, which may have a material and adverse impact on our revenue, business, financial condition, and results of operations."  Facebook, Inc., Form S-1 (Feb. 1, 2012) at 11.

22.     Facebook also disclosed that the proliferation of smartphones could materially affect its ongoing prospects.  "[O]ur users could decide to increasingly access our products primarily through mobile devices. We do not currently directly generate any meaningful revenue from the use of Facebook mobile products, and our ability to do so successfully is unproven. Accordingly, if users continue to increasingly access Facebook mobile products as a substitute for access through personal computers, and if we are unable to successfully implement monetization strategies for our mobile users, our revenue and financial results may be negatively affected." *Id.* at 13.

23.     On or around April 1, 2012, Zuckerberg called Kevin Systrom, one of the co-founders of Instagram, offering to purchase his company.

24.     Instagram was a mobile-based product that had grown exponentially since its launch a year and a half earlier. By April 2012, Instagram had approximately 27 million users.  When Instagram released an Android version of its app—right around the time of Zuckerberg's call—it was downloaded more than a million times in less than a day.

25.     On April 9, 2012—just days after Zuckerberg's overture to Systrom—Facebook, Inc. purchased Instagram, Inc. for $1 billion in cash and stock.  This purchase price was double the valuation of Instagram, Inc. implied by a Series B round of funding closed days earlier by the company.

26.     Facebook, Inc. held its initial public offering less than two months after acquiring Instagram, Inc.

27.     Zuckerberg's willingness to pay a premium for Instagram was driven by his instinct that the Instagram product would be vital to reaching a younger, smartphone-oriented audience—and, as such, critical to his company's going-forward success.

28.     Notably, around this time frame, studies began to confirm the addictiveness of social media—and the negative consequences it can have for adolescents.

29.     Zuckerberg's acquisition of Instagram proved prescient. Although initially operating at a loss, Instagram's revenue grew exponentially from 2015 to 2022.  A study conducted in the second quarter of 2018 showed that, over the prior year, advertisers' spend on Instagram grew by 177%—more than four times the growth of ad spend on Facebook.  Likewise, visits to Instagram rose by 236%, nearly *thirty* times the growth in site visits experienced by Facebook during the same period.  By 2020, survey research indicated that 85% of U.S. teenagers used Instagram at least once a month.  And by 2021, Instagram accounted for over half of Meta's $50.3 billion in net advertising revenues.

30.     Meta has claimed credit for Instagram's success since the acquisition.  Zuckerberg told market analysts that Instagram "wouldn't be what it is without everything that we put into it, whether that's the infrastructure or our advertising model, our expanded safety services and a lot more."

## Instagram's Defective Design

31.     Instagram owes its success to the defective design of its product, including its underlying computer code and algorithms, and to Defendants' failure to warn children and parents that the product presents serious safety risks.  Defendants' tortious conduct begins before a user has viewed, let alone posted, a single photo.

32.     Defendants describe the Instagram product as a "mobile-first experience."  Indeed, the great majority of Instagram users in the U.S. access Instagram through a mobile application for either the iOS or Android operating system.

33.     In order to use the Instagram product, one must first obtain it.  On a mobile device, this is accomplished by visiting a store from which the product can be downloaded—either the Apple App Store (for iPhone users) or the Google Play Store (for Android users).  Once Instagram is installed onto an individual's smartphone, they can open the application.  At this point, they are

asked to create a new account, which involves entering an email address, adding a name, and creating a password and username.

34.      The prospective user is then invited to press a colorful button that says "Sign up."  In small print above this button, the user is informed: "By tapping Sign up, you agree to our Terms, Data Policy and Cookies Policy."  The text of those policies is not presented on the sign-up page.



COMPLAINT

While the words "Terms," "Data Policy," and "Cookies Policy" are slightly bolded, the user is not informed that they can or should click on them, or otherwise told how they can access the policies.

35. The rare teenager with the foresight to click on the words "Terms" or "Data Policy" would be informed about the scope but misled about the purpose of Defendants' data collection. They would receive no warning whatsoever that Instagram is designed to be addictive, or that Defendants know Instagram creates a serious safety risk for kids.

36. Instagram's Data Policy (current as of July 25, 2022) makes clear that Defendants collect a breathtaking amount of data from Instagram's users, including:

    a. "the content, communications and other information you provide when you use our Products, including when you sign up for an account, create or share content, and message or communicate with others;"

    b. "information in or about the content you provide (like metadata), such as the location of a photo or the date a file was created;"

    c. "information about the people, accounts, hashtags and Facebook groups, and Pages you are connected to and how you interact with them across our Products, such as people you communicate with the most or groups you are part of;"

    d. "information about how you use our Products, such as the types of content you view or engage with; the features you use; the actions you take; the people or accounts you interact with; and the time, frequency and duration of your activities," including "when you're using and have last used our Products, and what posts, videos and other content you view on our Products;"

    e. "information about you, such as when others share or comment on a photo of you, send a message to you, or upload, sync or import your contact information;"

    f. "information from and about the computers, phones, connected TVs and other web-connected devices you use that integrate with our Products," including "information

about operations and behaviors performed on the device, such as whether a window is foregrounded or backgrounded, or mouse movements;"

g.   "Bluetooth signals, and information about nearby Wi-Fi access points, beacons, and cell towers;"

h.   "information such as the name of your mobile operator or ISP, language, time zone, mobile phone number, IP address, connection speed and, in some cases, information about other devices that are nearby or on your network;" and

i.   "information about your online and offline actions and purchases from third-party data providers who have the rights to provide us with your information."

37.   On July 26, 2022, Defendants updated their Data Policy (rebranding it as a "Privacy Policy"). This updated policy makes clear that the scope of information Defendants collect about Instagram users has not materially changed.

38.   While the Data Policy indicates the scope of user information collected by Defendants through the Instagram product, it is far less forthcoming about the purposes for which this data is collected and its consequences for younger users.

39.   The Data Policy presents those goals as benign and even positive for its users—"[t]o create personalized Products that are unique and relevant to you" and to "make suggestions for you (such as groups or events you may be interested in or topics you may want to follow)."

40.   The Data Policy says nothing about Defendants' real motives—personalizing the product to maximize its potential for addiction, creating a dependency that keeps users on longer and more frequently, so that more advertisements are viewed and Defendants can collect more money from advertisers (their true customers). *See supra* ¶ 4. The more time that individuals spend using Instagram, the more Defendants learn about the user, the more advertisements they can deliver, and the more money they can make. This addiction is driven, in part, by the algorithms that

power Instagram, which are designed to induce compulsive and continuous scrolling for hours on end.

41.     The Data Policy also contains no warnings whatsoever that use of the product at the intensity and frequency targeted by Defendants creates known risks of mental, emotional, and behavioral problems for children, Defendants' key audience.

42.     Instagram's collection and utilization of user data begins the instant she presses "Sign Up."  At that point, Instagram prompts a new user to share a substantial amount of personal data.  First, Instagram asks the user to share her personal contacts, either by syncing contacts from her phone and/or syncing her "Friends" from Facebook—"We'll use your contacts to help you find your friends and help them find you."  Next, Instagram asks the new user to upload a profile photo. After that, Instagram asks the user to "Choose your interests" so that she can "Get started on Instagram with account recommendations tailored to you."  And finally, Instagram invites the new user to "Follow accounts to see their photos and videos in your feed," offering a variety of recommendations.  After sign-up is completed, Instagram prompts the new user to "post" either a photo or a short video.

43.     Instagram's collection and utilization of user data continues unabated as a new user begins to use the product.  Specifically, Instagram tracks a host of behavioral data—ranging from what the user looks at, to how long they hover over certain images, to what advertisements they click on or ignore—to build out a comprehensive and unique fingerprint of the user's identity.  As the user continues to use Instagram, the product's algorithm works silently and passively in the background to refine this fingerprint, by continuously monitoring and measuring patterns in their behavior.  Instagram's algorithm is sophisticated enough that it can leverage existing data to draw educated inferences about even the user behavior it does not track firsthand.  Instagram's comprehensive data collection allows it to target and influence its users in order to increase their "engagement" with the product.

44.     The Instagram product consists primarily of a never-ending and personalized feed of photographs, video snippets, and advertisements, which Instagram's proprietary algorithms generate and deliver to each user.  In the app's "Home" pane, this feed includes (but is not limited to) photos and videos posted by Instagram users that the user has elected to "follow."  In the app's "Explore" pane, the feed consists almost exclusively of photos and videos from users the user has *not* elected to "follow."  In both cases, Instagram's algorithms create the feed by evaluating the user's data to determine what material will maximize their attention and time spent using the product. Behavioral training via the intermittent rewards programmed into the app keep users endlessly scrolling, oftentimes despite their desire to put their phone down and move onto other activities.

45.     To further drive user engagement (and thereby drive advertising revenue), Instagram also utilizes a series of engineering features that are carefully designed to exploit users' neurobiology in order to dominate their attention.  These product features are deliberately addictive, particularly to teenagers.  Defendants do not warn prospective or current users about these features or their safety risks.

46.     Instagram uses intermittent variable rewards ("IVR") to train teen and pre-teen users to use their product compulsively.  IVR is based on insights from behavioral science dating back to research conducted by B. F. Skinner in the 1950s, who found that laboratory mice respond most voraciously to unpredictable rewards.  In one famous experiment, mice that pushed a lever received a variable reward (a small treat, a large treat, or no treat at all).  Compared with mice who received the same treat every time, the mice who received only occasional rewards were more likely to exhibit addictive behaviors such as pressing the lever compulsively.  Slot machines have exploited this principle in humans for years by delivering rewards using intermittent variable reward ratios.

47.     Like a slot machine, Instagram is carefully engineered to induce compulsive behavior. It does this by methodically spacing out dopamine triggering stimuli with dopamine gaps. Dopamine is a "feel-good" hormone that is part of the body's reward system, and the human brain

is hard-wired to seek out activities that release it, including eating, drinking, positive social interactions, and other activities that aid survival.

48.     One aspect of Instagram that triggers the release of dopamine in the brain is the "likes" feature, which allows users to indicate that they "like" a post and prominently displays the number of times a post has been liked by other users.  As New York University professor and social psychologist Adam Alter has explained, Instagram's "like" feature gives users a dopamine hit similar to drugs and alcohol: "The minute you take a drug, drink alcohol, smoke a cigarette . . ., when you get a like on social media, all of those experiences produce dopamine, which is a chemical that's associated with pleasure.  When someone likes an Instagram post, or any content that you share, it's a little bit like taking a drug.  As far as your brain is concerned, it's a very similar experience."

49.     Every time a response to a stimulus (e.g., using Instagram), results in a reward (e.g., receiving likes), dopamine is released in the brain and associations between the stimulus and the feel-good reward become stronger through a process called long-term potentiation.  Paradoxically, as Skinner's experiments demonstrate, intermittent variable rewards create stronger associations than fixed rewards.  Because brains are wired to search for the next reward, depriving the brain of the dopamine-releasing stimulus causes anticipation and craving to develop, strengthening addiction.

50.     Like the mice in Skinner's experiments, humans who receive intermittent rewards are more likely to exhibit compulsive behavior.  In fact, a slot machine user may experience a rewarding feeling just from the anticipation that comes in the moments after he has pulled the lever and before he finds out whether he has won or lost.  Similarly, Instagram users feel compelled to continue using the app or check it regularly in hopes of getting a dopamine hit that will satisfy their craving.  Unlike a slot machine, which delivers rewards at random, Instagram is designed to purposefully withhold and release rewards on a schedule its algorithms have determined is optimal

to heighten a user's craving and keep them coming back for more.  For example, Instagram's notification algorithms sometimes withhold "likes" on a user's posts and then later deliver them in a large burst of notifications.

51.    The "like" feature has an especially powerful effect on teenagers. Researchers at UCLA who used magnetic resonance imaging to study the brains of teenage girls as they viewed Instagram posts found that their perception of a photo changed depending on the number of likes the photo had generated.  The fact that an image was highly liked—regardless of its content—instinctively caused the girls to prefer that image.  As the researchers put it, teens react to perceived "endorsements," never mind that Instagram likes are often fake, purchased, or manufactured.

52.    Several other product features employed by Instagram collectively lead to negative mental health outcomes for teenagers, in part because they are designed to addict that demographic to the product and in part because they prey on teenagers' desire for validation and need for social comparison.  These include but are not limited to the following tools:

   a.   Instagram makes available and promotes the use of photograph filters that allow users to manipulate photos to make themselves look thinner or meet other perceived standards of beauty.  Instagram tools with names like "Slim & Skinny," "Body Plastic Surgery," "FaceTune," and "Perfect365" can help users "solve" body image problems by slimming waists, thinning noses, lengthening legs, enhancing breasts, increasing muscle, changing skin tone, removing skin blemishes, and whitening teeth. These tools create and exacerbate body image problems among teens and pre-teens, who are not always able to tell when such filters have been applied, and who find themselves judging their own bodies against others' unrealistic and enhanced images.

   b.   Instagram's algorithms prioritize not only photos and videos that may appeal to the user based on her data, but also photos and videos that have prompted high levels of

engagement by other users because they are provocative or stimulative.  The intent

of engagement-based ranking is not to entertain or inform, but once again to drive

further use of the product.  This is accomplished by taking advantage of two distinct

features of brain chemistry.  First, stimulative content drives users to comment, then

remain in a heightened state of anticipation for a potential dopamine pay-off—

comments to their comment, which are inherently unpredictable in content and

timing.  Second, engagement-based ranking takes advantage of the fact that there are

multiple types of dopamine neurons that are connected with distinct brain networks

and have distinct roles in motivational control.  In addition to the dopamine reward

loop triggered by positive feedback, other dopamine neurons are impacted by salient

but *non*-rewarding experiences that are aversive and alarming.  By preying on the

user's dopamine cycle in these two distinct ways, Instagram's algorithm keeps users

"engaged" on the product as long as possible.

c.  Instagram uses expiring posts to promote compulsive use.  For example, the "Home"

interface of the app displays a scrollable list of "Stories" from followed Instagram

users. Stories are photos and videos that automatically disappear after 24 hours and

do not otherwise appear in a user's feed. Teen users must access Instagram daily or

risk missing out on these temporary posts.  Similarly, if the user leaves the

application for more than a few minutes, the photos and videos the user viewed

recently in Feed, Reels, and Explore disappear and the stream resets at the top of the

screen.  This design choice can make users reluctant to exit or stop using the app

even briefly. For impressionable teens, Instagram isn't something you can just put

down and pick up again later without missing out.

d.  Instagram thwarts efforts by teens to moderate their compulsive usage by

affirmatively contacting them outside of the app, by text and email, to notify them of

posts and other activity in the application that they may have missed. This includes posts by followed users, other posts Instagram's algorithms have selected for the teens, and alerts that another user has liked or commented on a post made by the user.  These strategically timed notifications are intended to lure users back on to Instagram. In addition, Instagram notifies the sender of a direct message when the recipient of the message has read it, putting pressure on the recipient to respond right away.  Instagram is aware that one type of notification it commonly sends, "What You Missed," leads to feelings of isolation, exploits users' fear of missing out, and increases compulsive use in minors.  These and other types of behavioral nudges are engineered to recapture the attention of teens who manage to step away.  In this way, individualized notifications promote dependency on Instagram and push teens to increase their usage.

e. Instagram presents photographs and video clips interspersed with ads to users in a never-ending stream, known as the "scroll" or "infinite scroll." Anytime a user scrolls to the seeming end of a list, Instagram's algorithms select and display additional photos, videos, or ads they predict will hold the user's attention.  Infinite scroll contributes to Instagram's addictiveness by supplying users with an endless stream of stimuli that may trigger a dopamine hit, keeping them using the product and further strengthening their addiction.

53.     Features like those described above are designed to exploit users' natural tendency to compulsively return to the source of pleasure in anticipation of receiving another hit of dopamine—which Instagram's algorithm strategically withholds and delivers to optimize engagement. Teenagers who attempt to discontinue or taper Instagram use may experience symptoms of withdrawal common to other addictions, such as cravings, anxiety, irritability, insomnia, depression, anger, and emotional and behavioral instability.  Over time, the threshold needed to trigger a

- 17 -
COMPLAINT

dopamine response increases, and teens may need to continue using Instagram excessively just to feel normal.  Some users describe mindlessly scrolling through their Feed for hours to satisfy their craving for the intermittent pleasure of an occasional dopamine-inducing post or "like."

54.     Features like those described above also increase dependency on the product by prompting heavy users to withdraw from the real world.  Users' inability to live up to the edited, idealized images presented in others' photos can prompt a sense of social isolation, and a compulsive need to use Instagram as the only means to access the fake world constructed by its algorithm.

55.     Instagram's inclusion of the features mentioned above is not happenstance. Their effectiveness in keeping users "engaged" (addicted) rests on principles of behavioral psychology that Defendants and their employees have actively studied. In the 2000s, key former and present employees of Defendants—including both of Instagram's co-founders—studied and mastered these principles, and techniques used to exploit them, through a program at Stanford known as the Persuasive Technology Lab.

56.     Minors are particularly susceptible to the behavioral manipulation techniques taught at the Persuasive Technology Lab and intentionally built into the code of Instagram. Minors' frontal lobes are not fully developed, resulting in diminished impulse control, emotional immaturity, underdeveloped psychological resiliency, and inconsistent decision-making capacity. As such, they are uniquely susceptible to feelings of withdrawal after a dopamine hit and uniquely susceptible to "curing" that withdrawal through additional usage, which makes them easy targets for a reward-based system like Instagram.

57.     Instead of avoiding these vulnerable consumers, Defendants have pursued them aggressively.  Since its acquisition by Meta, Instagram has experimented with a host of additional features to drive pre-teen and teenage engagement and, in doing so, increase advertising revenues.

58.     In December 2013, Instagram added Direct, a feature that allows users to send photos to specific people directly from the app.  This function allowed Instagram to compete against messaging services like Snapchat that were gaining popularity among teens and pre-teens.

59.     In June 2015, Instagram opened the product to all advertisers, weaving advertisements into users' Feeds.

60.     In August 2016, Instagram introduced Stories, another feature intended to compete against Snapchat. Systrom has admitted that the feature was copied from another Snapchat feature popular with children called "Snapchat Stories."

61.     In December 2016, Instagram added the ability to "like" comments to photographs (symbolized by a heart emoji).  The "Like" button intensified and multiplied the volume of feedback that teen users received (or didn't receive) on their photographs, further exploiting their desire to compare themselves to others.  The number of "likes" became a source of additional motivation by users to seek social acceptance and validation.

62.     In April 2017, Instagram introduced another feature with obvious appeal to children, an offline mode that allows users to view posts and interact with the application even when they do not have access to an internet connection.

63.     In 2018, Systrom and Instagram co-founder Mike Krieger resigned from Instagram, and Facebook named Adam Mosseri, a 10-year veteran of Facebook, as Instagram's new head.

64.     Under Mosseri's leadership, Instagram has continued to roll out new product features focused on pre-teen and teenage engagement. In 2018, Facebook allotted most of its global annual marketing budget to targeting 13- to 15-year old children, a marketing demographic it calls "early high school."  According to Defendants, these users represent the platform's "teen foothold" for its "US pipeline."  Defendants have expressly sought to maximize metrics like "teen time spent" on the Instagram product.

65. In August 2020, Defendants introduced "Reels," in response to the rising popularity of TikTok among teens. "Reels" shows short videos posted by other Instagram users in a full-screen format popularized by TikTok. Reels has since become one of the most used features on the application. In late July 2022, Mosseri announced that "more and more of Instagram is going to become video over time."

66. Defendants' decision to hook teenage users by literally rewiring their brains has not aged well for all of their former employees. Chamath Palihapitiya, the former Vice President of User Growth at Facebook, admitted that he feels "tremendous guilt" about his contributions to social media, saying "[t]he short-term, dopamine-driven feedback loops that we have created are destroying how society works."

### Instagram's Failure to Verify the Age of its Users

67. Internal Meta documents demonstrate that Instagram's ability to generate advertising revenue is premised largely on its ability to attract pre-teen and teenage users, and to keep these users "engaged" for longer and more frequent periods of time. For that reason, Instagram markets itself to children and develops features that are designed to addict them to the product.

68. Defendants' Terms of Use require individuals to be at least 13 years old to use the Instagram product. However, during most of its history, Instagram has not even asked its users to disclose—let alone, verify—their date of birth. During that time, Defendants knew that children under the age of 13 were using Instagram. And they certainly could have figured this out based on posted photos of elementary school age users. Yet Defendants continued to promote and target the product to children. As long as a new user simply clicked a box confirming that she was at least 13 years old, Defendants asked no questions, engaged in zero follow-up, and let the user access the product indefinitely.

69. It was only in December 2019, after Instagram had been on the market for more than seven years, that Defendants began asking new users of the product to disclose their ages during

account creation. But even then, Defendants did not ask *existing* users to disclose their ages,

effectively grandfathering in underage users.  Defendants did not attempt to correct *that* problem

until August 30, 2021.  And Defendants did not attempt to begin actually verifying the ages of its

users until this year.

70.     Even today, Defendants do not as a default matter require users to verify their ages

upon signing up to use the product.  Defendants routinely allow pre-teens to misrepresent their ages

as 13 or 40 or any other age—without so much as asking for proof.  This is analogous to letting a

teenager enter a nightclub and buy alcohol simply because he says he is over 21.

71.     Notably, other online products and games employ a substantially more robust

verification scheme before granting children access.  Defendants could employ such a system at

relatively low cost.  Indeed, Defendants have such tools at their disposal.  Perversely, they employ

age verification when a user self-reports they are *younger* than 13.  In that case, Defendants provide

a user with what amounts to an appeal right: "if you believe we made a mistake, please verify your

age by submitting a valid photo ID that clearly shows your face and date of birth":

72.     That is, instead of asking users to prove they are really *over* 13, Defendants ask them if they are really sure they are *under* 13.  At best, this reflects a completely upside-down view of Defendants' duty of care, using age verification to screen *in* minor users but not to screen them *out*.  At worst, Defendants' "are you sure you're really under 13" question invites pre-teens to falsify their identification to gain access to Instagram.

## **Instagram's Role in Creating a Public Health Crisis**

73.     Given Instagram's intentionally addictive features, Defendants' aggressive efforts to market Instagram to children, Defendants' knowledge of behavioral engineering principles, and scientific research published as early as 2016 (*see infra*), Defendants should have known its product presented safety risks to kids.  But even holding that aside, Defendants have *actually* known since at

least 2019 that Instagram is addictive and has a corrosive effect on the well-being of pre-teen and teenage users.

74.     Meta has an internal research team comprised of employees with expertise in computer science, psychology, and quantitative and qualitative analysis.  From 2019 to 2021, this team conducted a "teen mental health deep dive" which included focus groups, diary studies, and online surveys.

75.     One large-scale study conducted by Defendants' researchers surveyed tens of thousands of Instagram users and paired the results with data that Defendants harvested about the time each respondent spent on Instagram and the type of content they viewed.

76.     The evidence collected by Meta's own research team is damning.  Among other findings, Defendants' researchers learned that:

- 32% of teenage girls said that when they felt bad about their bodies, Instagram made them feel worse;

- One in five teens say that Instagram makes them feel worse about themselves;

- Teenagers who struggle with mental health say that Instagram worsens those problems;

- Teenagers blame Instagram for the increase in anxiety and depression among teens in recent years—a response that was unprompted and consistent across all groups;

- Among teens who reported suicidal thoughts, 13% of British users and 6% of American users traced the desire to kill themselves to Instagram;

- 40% of teen users of Instagram in the U.S. and U.K. who reported feeling "unattractive" said the feeling began while using the product;

- About a quarter of teens who reported feeling "not good enough" said the feeling started on Instagram; and

- Many teens said Instagram undermined their confidence in the strength of their friendships.

77.     Importantly, Defendants' researchers concluded that Instagram—not social media more broadly—was principally to blame.  In March 2020, Defendants' researchers noted that, as compared to competitors like Snapchat, VSCO, and YouTube, Instagram combines a high degree of realism and a high degree of formality.  As a result, "[s]ocial comparison is worse on Instagram." Moreover, the researchers were clear in explaining that Instagram itself—not the photographs, captions, or hashtags shared on it—was responsible for this problem.  In one chart illustrating the "High" amount of "Body, Appearance Comparison" on Instagram, researchers cited as contributing factors "Product mechanics (addicting)" and "Explore, discover, stalk (down the rabbit hole)."  In another slide, researchers noted the particular problems with Instagram's Explore feature, as it contains "Tons of body image triggers" that are "Intimidating" to users.

78.     Children are developmentally unprepared for the psychological ramifications of peer judgment and online comparisons.  When directed at this population, the Instagram algorithm is a more dangerous, advanced, and self-reinforcing version of the "hotness" ranking system that powered Zuckerberg's Facemash website.

79.     Defendants' internal researchers were not only clear about the fact that Instagram causes a high level of social comparison for teenagers; they were clear-eyed that the consequences were dire.  They observed that the addictive nature of the Instagram product, combined with a tendency for users to share only the best moments and a "pressure to look perfect," can send teens on a spiral that includes anger, withdrawal, insecurity, and body dysmorphia—"a series of emotions that in many ways mimic[s] stages of grief."  They further warned that "[u]sers experience of [this] downward spiral is exacerbated by our platform."  "Comparisons on Instagram can change how young women view and describe themselves," they noted, changing a girl's self-perception from "multi-dimensional" and "centered" to "not in control," "dark," boxed in," "low esteem," and "anxious."  The researchers' conclusions were stark: "Mental health outcomes related to this can be severe," and can include "eating disorders," "body dysmorphia," "body dissatisfaction," "depression," and "loneliness."

80.     Frances Haugen explained all this succinctly to Congress: "Facebook's own research says Instagram is actually distinctly worse than, say, TikTok or Snapchat or Reddit, because TikTok

- 24 -

COMPLAINT

is about doing fun things with your friends.  Snapchat is about faces and augmented reality.  Reddit is vaguely about ideas.  But Instagram is about bodies and about comparing lifestyles."

81.     Defendants' internal research is consistent with several scientific and medical studies finding that social media use—particularly multiple hours of social media use a day—correlates with and in fact causes negative body image and mental, physical, and developmental health issues among teens.  Collectively, these studies show that 1) increased social media use can lead to body dissatisfaction, anxiety, depression, and self-harming behaviors such as eating disorders; and 2) Instagram exacerbates this dissatisfaction, particularly among adolescent girls, due to its focus on edited, "idealized" body images.

82.     In 2016, a study of more than 450 teens found that greater social media use, nighttime social media use, and emotional investment in social media—such as feeling upset when prevented from logging on to social media—were each linked with worse sleep quality and higher levels of anxiety and depression.

83.     In 2017, British researchers asked 1,500 teens to rate how each of the major social-media platforms affected them on certain well-being measures, including anxiety, loneliness, body image, and sleep.  Instagram scored as the most harmful.

84.     In 2018, the Campaign for Commercial-Free Childhood sent Zuckerberg a letter signed by 118 public health advocates explaining that a growing body of research demonstrates that excessive use of digital devices and social media is harmful to children and teens.  The letter noted the results of a 2014 study of girls between the ages of 10 and 12, which found that the more they used social networking sites, the more likely they were to idealize thinness, to have concerns about their bodies, and to have dieted.

85.     In 2018, a randomized control study exposed 220 female undergraduate students to a set of thin-ideal or average images paired with a low or high number of likes presented in an Instagram frame.  Results showed that exposure to thin-ideal images led to greater body and facial dissatisfaction than average images.  Moreover, greater investment in Instagram likes was associated with more appearance comparison and facial dissatisfaction.

86.     In 2018, a *Journal of Social and Clinical Psychology* study examined a group of college students whose use of Instagram, Facebook, and Snapchat was limited to 10 minutes per day per platform.  The study found that this limited-use group showed "significant reductions in loneliness and depression over three weeks" compared to a control group that used social media as usual.

87.     In 2018, a systematic literature review of nine studies published in the *Indian Journal of Psychiatry* concluded that social networking platforms "contribute to increased exposure to and engagement in self-harm behavior, as users tend to emulate self-injurious behavior of others online, adopt self-injurious practices from self-harm videos, or are encouraged and acclaimed by others, thus normalizing self-injurious thoughts and behavior."

88.     A 2019 study of more than 6,500 adolescents in the United States ranging in age from 12 to 15 years old found that adolescent social media use of 30 minutes or more a day was associated with an increased risk of depression and anxiety.  Notably, this association remained significant even *after* adjusting for demographics, past alcohol and marijuana use, and history of mental health problems.

89.     Another 2019 study of more than 10,000 teens from 13 to 16 years old in England found that girls who used social media more than 5 hours a day were three times more likely than nonusers to experience clinically significant symptoms of depression, even after adjusting for past mental health struggles.  A 2020 analysis of the same teens found that heavy social media users were twice as likely to engage in self-harming behaviors such as cutting.

90.     A 2019 survey of American adolescents ages 12-14 found that a user's displeasure with their body could be predicted based on their frequency of social media use and based on the extent to which they engaged in behaviors that adopt an observer's point-of-view (such as taking selfies or asking others to "rate one's looks"). This effect was more pronounced among girls than boys.

91.     In 2020, a study of Australian adolescents found that investment in others' selfies (through likes and comments) was associated with greater odds of meeting criteria for

- 26 -
COMPLAINT

1   clinical/subclinical bulimia nervosa, clinical/subclinical binge-eating disorder, night eating

2   syndrome, and unspecified feeding and eating disorders.

3       92.     A 2022 study of Italian adolescent girls (12-17) and young women (18-28) found

4   that Instagram's image editing and browsing features combined with an emphasis on influencer

5   interactions promulgated unattainable body ideals that caused users to compare their bodies to those

6   ideals.  These trends were more prominent among adolescent girls, given their higher susceptibility

7   to social pressures related to their bodies and given the physical changes associated with puberty.

8       93.     Eating disorders expert Bryn Austin, a professor in Harvard University's Department

9   of Social and Behavioral Sciences, has explained why Instagram is particularly and uniquely

10  harmful to teens: "From experimental research, we know that Instagram, with its algorithmically-

11  driven feeds of content tailored to each user's engagement patterns, can draw vulnerable teens into a

12  dangerous spiral of negative social comparison and hook them onto unrealistic ideals of appearance

13  and body size and shape."

14      94.     Dr. Jean Twenge, a professor of psychology at San Diego State University,

15  underscored the significance of the risks Instagram poses to teen girls, saying: "For some people it

16  might be tempting to dismiss this as teen girls being sad, [but] we're looking at clinical-level

17  depression that requires treatment.  We're talking about self-harm that lands people in the ER."

18      95.     Dr. Angela Guarda, the director of the eating-disorders program at Johns Hopkins

19  Hospital and an associate professor of psychiatry in the Johns Hopkins School of Medicine, said it

20  is common for her patients to say they learned from social media tips on how to restrict food intake

21  or purge.  She estimates that Instagram and other social-media apps play a role in the disorders of

22  about half her patients.

23      96.     Even the United States Surgeon General has identified social media as a contributing

24  cause of America's "youth mental health crisis."

25      97.     With respect to the crisis, the Surgeon General's recent findings are bleak.  In a

26  December 2021 report, the Surgeon General stated that, from 2009 to 2019, the share of high school

27  students who reported persistent feelings of sadness or hopelessness increased by 40%, to more than

28

1 in 3 students.  Suicidal behaviors among high school students also increased by 36% during that same time period, with 19% seriously considering attempting suicide.  Between 2007 and 2018, suicide rates among youth ages 10-24 in the U.S. increased by a staggering 57%.

98.     The situation is particularly dire for young girls.  According to federal data, more than one in four adolescent girls experienced a major depressive episode at some point during 2020—representing a twofold increase since 2010.  Rates of depression among young women have risen steadily since 2012, suggesting the cause or causes of their struggles are the result of persistent phenomena.

99.     With respect to social media's role in this crisis, the Surgeon General was direct: "In these digital public spaces, which [are] privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society.  Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways."

### Defendants' Attempted Cover-Up

100.     Defendants should have known and have actually known for years that the Instagram product has a toxic effect on teens, and in particular teen girls.  Defendants have also known for years that they have an opportunity—and a responsibility—to do something about that problem, as an internal Meta presentation from November 2019 made clear: "Negative social comparison and related issues with body image are especially crucial to tackle given the high ranking among teens." "Negative social comparison is a unique opportunity area for Instagram to tackle given its relatively higher reach, intensity *and our assumed responsibility*."

101.     Unfortunately, Defendants did not live up to their assumed responsibility.  They did not warn consumers about these risks and potential harms.  Nor did they take affirmative measures to respond to their researchers' findings by substantially and timely altering their product, adjusting

the product algorithms, warning parents, or establishing safeguards to limit or eliminate its usage by children.

102.     Instead, Defendants downplayed or outright ignored warnings from internal and external research highlighting Instagram's myriad safety risks while emphasizing its perceived positive attributes—not just through marketing materials, but through statements made to Congress by Defendants' highest-ranking executive.

103.     On April 10, 2018, Mark Zuckerberg testified before the U.S. Senate Committee on Commerce, Science, and Transportation.  When asked whether his companies "[h]ire consulting firms to help them figure out how to get more dopamine feedback loops so that people don't want to leave the platform," he replied, "No . . . that's not how we talk about this or how we set up our product teams. We want our products to be valuable to people, and if they're valuable, then people choose to use them."

104.     Zuckerberg's statement to Congress was deceptive at best.  Several months earlier, Facebook's founding president Sean Parker explained that Zuckerberg and other Facebook founders understood they were "exploiting a vulnerability in human psychology" through their products: "The thought process that went into building these applications, Facebook being the first of them … was all about: 'How do we consume as much of your time and conscious attention as possible?' And that means that we sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or post or whatever.  And that's going to get you to contribute more content, and that's going to get you … more likes and comments."  "The inventors, creators – it's me, it's Mark, it's Kevin Systrom on Instagram, it's all of these people – understood this consciously."

105.     On December 23, 2020, Defendants were asked by the Senate Committee on the Judiciary whether they could "determine whether increased use of its platform among teenage girls has any correlation with increased signs of depression [or anxiety]."  Defendants answered "No."

Defendants were also asked what research they had conducted internally on the mental health impacts of social media use.  Defendants responded that "[t]he effects of social media are still being studied."

106.    Both of these responses were misleading.  Defendants concealed the fact that, according to their internal studies, Instagram "make[s] body image issues worse for one in three teen girls" and that "[m]ental health outcomes related to this can be severe."  Furthermore, Defendants have long understood the power of their products to manipulate the mental health of their users.  For example, through an experiment conducted on over 600,000 Facebook users in January 2012, Facebook, Inc. determined it could influence the mood and emotions of its users by only showing them positive or negative posts.  The head data scientist leading that research effort for Facebook concluded: "These results indicate that emotions expressed by others on Facebook influence our own emotions, constituting experimental evidence for massive-scale contagion via social networks."

107.    On March 25, 2021, Mark Zuckerberg testified before the U.S. House of Representatives Committee on Energy and Commerce.  Zuckerberg was asked point blank, "Do you believe that your platform harms children?"  In response, he testified, "I don't believe so.  This is something that we study and we care a lot about; designing products that improve peoples' well-being is very important to us.  And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that's for teens or for people who are older than that."

108.    Zuckerberg's statement to Congress was misleading.  He failed to mention that, according to Meta's internal studies, one in five teens say that Instagram makes them feel worse about themselves, and about a quarter of teens who reported feeling "not good enough" said the feeling started on Instagram.

109.    During the same hearing, Zuckerberg misled the public by claiming that users spend more time on Instagram not because it is engineered to be addictive, but simply because it is an excellent product.  He testified: "I have heard a lot of people say that we are optimizing for keeping people on the service. The way we view this is that we are trying to help people have meaningful social interactions. People come to social networks to be able to connect with people. If we deliver that value, then it will be natural that people will use our services more."

110.    Zuckerberg's statement to Congress was misleading given Defendants' internal research reporting that young Instagram users feel addicted to the app and lack the wherewithal to limit their use of it.

111.    Zuckerberg's litany of misrepresentations did not stop there.  During the same hearing, Zuckerberg claimed, "I don't give our News Feed team or our Instagram team goals around increasing the amount of time people spend [on the products]."

112.    This testimony—which echoed similar refrains from Zuckerberg during a November 2020 Senate hearing—was misleading if not an outright lie.  Internal documents leaked by Haugen show that Defendants have actively monitored and focused on the metric "teen time spent" and designed new Instagram features to boost that metric.

113.    Finally, Zuckerberg misled the public regarding the ability of pre-teens to access Instagram.  Zuckerberg told Congress: "There is clearly a large number of people under the age of 13 who would want to use a service like Instagram. We currently do not allow them to do that." Zuckerberg also stated: "We don't allow children under the age of 13 on the services that run advertising."

114.    These statements were misleading, given Defendants' failure to implement age verification mechanisms despite its ability to do so, given its knowledge that pre-teens use Instagram, and given Defendants' "ultimate goal [of] messaging primacy with U.S. tweens."

115.    In advance of his March 25, 2021 testimony, Zuckerberg signed a False Statements Certification indicating his understanding that "knowingly concealing material information from this committee/subcommittee, is a crime (18 U.S.C. § 1001)."

116.    In addition to Zuckerberg's misleading statements to Congress, Defendants have made statements to the press, and put forward marketing materials directed at parents and kids, which have downplayed scientific and medical research concerning the safety risks of Instagram. For example, a "Parent's Guide" published by Defendants in or around February 2021 misleadingly stated, "When it comes to spending time on Instagram, there's no right or wrong answer when it comes to how much is too much or just right."  Similarly, a March 17, 2021 blog post by Defendants stated, "Protecting young people on Instagram is important to us. . . . We have dedicated teams focused on youth safety, and we work closely with experts to inform the features we develop."  And in May 2021, Mosseri told reporters that the research he had seen suggested Instagram's effects on teen well-being are likely "quite small."

117.    Statements like these convey the impression that there is no need to limit children's exposure to Instagram and that, in any event, Defendants have made Instagram a sufficiently safe environment for youth.  Defendants knew this to be false based on their own research.

118.    Following Frances Haugen's revelations in the fall of 2021, Defendants faced increasing scrutiny from regulators and the public.  Defendants' efforts to defend their actions did little more than highlight their willingness to prioritize profit over the safety of children.  During a podcast interview in September 2021, for instance, Instagram CEO Adam Mosseri stated: "We know that more people die than would otherwise because of car accidents, but by and large, cars create way more value in the world than they destroy … And I think social media is similar."

119.    On December 7, 2021—the day before Mosseri was scheduled to testify before Congress—Defendants rolled out new safety tools and features on Instagram, purportedly "to keep young people even safer on Instagram" and to "rais[e] the standard for protecting teens and

supporting parents online."  For example, Defendants introduced a "Take A Break" feature (which users need to enable affirmatively) through which Instagram prompts users to take a break from Instagram if they have been scrolling on the product for a certain amount of time—like a snooze button on an alarm.  The other features Instagram introduced included unspecified restrictions on what content is algorithmically force-fed to teens and tools for parents to view and manage the time their teens spend on the app.

120.    Upon information and belief, Defendants could have implemented more effective safety features and could have done so months if not years earlier.  They did so on December 7, 2021 only because they felt pressured by Haugen's revelations and Mosseri's upcoming testimony.

121.    In any event, Defendants' new measures were criticized by many as insufficient and belated.

122.    Senator Richard Blumenthal criticized Instagram's rollout of its new safety features, saying, "Instagram's baby steps fall short of protecting kids.  A PR gambit within hours of its CEO testimony is no substitute for real action."  Senator Blumenthal also noted that, just weeks earlier, his staff had registered an account for a 13-year-old girl and proceeded to follow some dieting and pro-eating disorder accounts.  Very soon thereafter, Instagram's algorithm began almost exclusively recommending that the young teenager follow more and more extreme dieting accounts—with names like "I have to be thin," "Eternally starved," and "I want to be perfect."

123.    Jeff Chester, the executive director of the Center for Digital Democracy, which advocates for privacy, civil, and human rights, called for Instagram to release its research and algorithms for an independent audit, saying: "Facebook is not getting the message.  It can't engage in piecemeal efforts.  It can't promise to do better.  It needs to publicly say what changes it's going to make and turn those changes over to policymakers and independent experts around the world."

124.    Instagram knows safety measures that rely on teens' self-control are particularly likely to fail.  One Meta researcher admitted: "Teens told us that they don't like the amount of time

they spend on the app but feel like they have to be present.  They often feel 'addicted' and know that what they're seeing is bad for their mental health but feel unable to stop themselves."

### Plaintiff's Experience with Instagram

125.     Laura Ashman is a 21-year-old resident of Fredericksburg, Virginia.  She first began using Instagram in 2013, when she was 12 or 13 years old.  In keeping with Instagram's goal and design, the frequency and intensity of Laura's usage increased as she started high school, until she was using the product up to 10 hours a day.  Laura's use was so extensive that that she would stay awake into the early morning to continue scrolling.  As a result of her addiction to Instagram, Laura started skipping school and avoiding her schoolwork.  When her parents attempted to take her smartphone away from her, Laura would become distraught, leading to fights with her family.  Over time, Laura went from earning straight A's to failing most of her classes, barely earning grades sufficient to graduate from high school.

126.     It was during this period of addiction that Laura started to harm herself.  When she was in the eighth grade, Laura used the razorblade from a pencil sharpener to cut herself.  This self-harming behavior rapidly increased in frequency and severity—and to this day, Laura wears the scars of her self-harm, up and down her arms and legs.  During her freshman year, Laura attempted to take her own life, the first of three such attempts.

127.     Laura's use of Instagram led her to develop a serious eating disorder and depression, in addition to her cutting and suicide attempts.  As a result, Laura has been hospitalized at multiple facilities for emergency mental health interventions, spent three months in residential treatment, participated in three partial-hospitalization treatment programs, and received care from intensive outpatient treatment programs—all in addition to continuous outpatient psychiatric and psychological treatment, which has included a wide range of medications to manage her symptoms.

128.    Plaintiff did not and could not have known about Defendants' misconduct until September 2021, when major media outlets like the Wall Street Journal began publishing internal company documents leaked by Haugen.  Furthermore, Defendants' concealment of its internal findings prevented Plaintiff from learning about Defendants' misconduct earlier.  As such, Plaintiff's complaint is timely.

129.    Pursuant to California Family Code § 6710, Plaintiff hereby expressly disaffirms any contract she may have made with any of the Defendants, or that Defendants may claim she made with them, prior to reaching the age of 18.

**PLAINTIFF'S CLAIMS**

**COUNT I: Strict Product Liability (Design Defect)**

**(Against All Defendants)**

130.    Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth herein.

131.    Instagram is a product.  Defendants have admitted as much to the Securities and Exchange Commission.  *See, e.g.*, Meta, Form 10-K (Feb. 3, 2022) at 3 ("The term 'Family' refers to our Facebook, Instagram, Messenger, and WhatsApp products."), 15 (referring to "significant revenue-generating products like Facebook and Instagram").  Meta's website makes this clear.  *See* Facebook, *What are the Meta Products?*, available at https://www.facebook.com/help/1561485474074139/?helpref=uf_share (last accessed July 7, 2022) ("The Meta Products include … Instagram").  Defendants' Data Policy refers to Instagram as a "product" over 70 times.  *See, e.g.*, Instagram Help Center, *Data Policy*, available at https://help.instagram.com/155833707900388 (last accessed July 19, 2022) ("People in your networks can see signals telling them whether you are active on our Products, including whether you are currently active on Instagram, Messenger or Facebook, or when you last used our Products.").

132.    Defendants are responsible for the design and manufacture of the Instagram product. Defendants employ dozens of individuals for this purpose, who they call "Product Managers."

133.    Defendants are responsible for distributing the Instagram product to end-users. Among other affirmative steps, they have made the product available for download via online marketplaces referred to as "stores," like the Apple App Store and Google Play Store.

134.    Defendants are responsible for marketing the Instagram product to end-users, and its marketing efforts have intensified.  In 2021, Defendants spent approximately $390 million marketing Instagram—over five times what it spent in 2018.

135.    The context of Instagram's distribution and use is "analogous to the distribution and use of tangible personal property."  Restatement (Third) of Torts: Prod. Liab. § 19(a).  Like tangible personal property, Instagram is manufactured by a team of product designers (who Defendants call "Product Managers"), distributed to the public through retail channels (the Apple App "Store" and the Google Play "Store"), marketed to the public for their personal use, and obtained by consumers from stores for their personal use.

136.    The Instagram product is defective in design because it fails to meet the safety expectations of its ordinary consumers when used in its intended or reasonably foreseeable manner. Children and teenagers are among the ordinary consumers of Instagram.  Indeed, Defendants aggressively market Instagram to pre-teen and teenage consumers.  Pre-teen and teenage consumers, and their parents and guardians, do not expect Instagram to be psychologically and neurologically addictive when it is used in its intended manner by its intended audience.  They do not expect Instagram's algorithms to make the product progressively more stimulative, in order to maximize young consumers' usage time.  They do not expect Defendants' profits to be directly tied to the strength of this addictive mechanism and dependent on teen consumers spending several hours a day using the product.

137.     The Instagram product is also defective in design because, on balance, the benefits of its design to young consumers do not outweigh its inherent risk of danger to those consumers.  The benefit of Instagram's design, at least according to Defendants, is that its algorithms prioritize photos and videos that young users are likely to want to see.  The inherent risks of danger of Instagram's design are that it is psychologically and neurologically addictive to young consumers, gradually amplifies the intensity of material it displays to promote the product's additional usage, and requires consumers to spend more and more time with the product to satisfy their cravings. These risks can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to body image and self-worth, and profound mental health issues for teenage consumers.  The dangers outpace the benefits by a mile.

138.     Defendants know and have known about feasible and relatively inexpensive changes to Instagram that will make it safer, such as robust age verification, strict time limits that lock out young users to prevent binge usage, creating a beginning and end to a user's "Feed," and blocking usage for minors during school hours or late at night.  Instead of implementing such features, Defendants chose to profit off Instagram's intentionally addictive features, without regard to their adverse consequences for the product's pre-teen and teen users.  Instead of prioritizing children's safety, Defendants prioritized higher revenue through a pipeline of young users.

139.     Even though Defendants should have known and likely did know about the safety risks of Instagram for years—and actually, demonstrably knew about those risks beginning at least in 2019—they did not begin to deploy even voluntary safety features for children until their wrongdoing was exposed by Frances Haugen in the fall of 2021.  Even today, Instagram's safety features are insufficient to prevent widespread harm to pre-teen and teenage users.

140.     The defective design of the Instagram product was the proximate cause of injuries to Plaintiff.  Due to Instagram's intentionally addictive design, Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and

related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

141.    Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements, conceal their internal findings, fail to warn minors and their parents, and delay implementation of feasible product safety features.  Defendants' decision to prioritize profits over children's safety and health is outrageous and justifies an award of exemplary damages pursuant to California Code § 3294, in such a sum that will serve to deter Defendants and other social media companies from similar conduct in the future.

**COUNT II: Strict Product Liability (Failure to Warn)**

**(Against All Defendants)**

142.    Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth herein.

143.    Defendants are responsible for the design, manufacture, and marketing of Instagram. Instagram is a product.

144.    The potential risks of harm to pre-teen and teenage users from Instagram were knowable before 2019, in light of scientific and medical literature that was generally accepted in the scientific community at that time.  At some point in 2019, if not earlier, Defendants actually knew of those potential risks given their own internal research.

145.    When used by children and teenagers in its intended or reasonably foreseeable manner, Instagram presents potential risks of substantial harm.  Instagram is intentionally designed to be addictive to its young users.  It creates that addiction in part by stoking young users'

insecurities and desire for validation.  These features can lead to a cavalcade of negative mental, social, behavioral, and even physical outcomes.

146.    Even though Defendants knew about these potential risks, ordinary consumers of Instagram, which again include children and teenagers, would not and could not have known. Instagram's addictive mechanism is buried in complex and proprietary algorithms that are undisclosed to the public.  Defendants intentionally hid from users their research detailing Instagram's negative effects on teen mental health.

147.    Defendants have not posted, and to this day still do not post, any warnings that minors' use of Instagram can lead to serious harms.  They do not post or display any warnings that the Instagram product ingests and analyzes user data with the goal of making itself progressively more addictive to the user.  And they fail to provide any such warnings to parents or guardians when their children become users of Instagram.

148.    New users of Instagram can identify themselves as teenagers, begin to use Instagram, and use the service indefinitely, without any time or usage limitations—without ever receiving a safety warning, and without ever having to provide information so that Defendants can warn their parents or guardians.

149.    Defendants' failure to warn Plaintiff or her guardians about the risks presented by Instagram was a substantial factor in the injury that Plaintiff suffered.  Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

150.    Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements,

conceal their internal findings, fail to warn minors and their parents, and delay implementation of

feasible product safety features.  Defendants' decision to prioritize profits over children's safety and

health is outrageous and justifies an award of exemplary damages pursuant to California Code

§ 3294, in such a sum that will serve to deter Defendants and other social media companies from

similar conduct in the future.

### COUNT III: Negligence (Design Defect)

### (Against All Defendants)

151.     Plaintiff restates each of the allegations in the preceding paragraphs as if fully set

forth herein.

152.     Defendants are responsible for the design, manufacture, and marketing of Instagram.

Instagram is a product.

153.     At all relevant times, Defendants have owed a duty to exercise reasonable care and

caution for the safety of children using the Instagram product, including Plaintiff.

154.     Defendants owe a heightened duty of care to minor users of Instagram because

children's brains are not fully developed, resulting in a diminished capacity to make responsible

decisions regarding their frequency and intensity of social media usage.  Children are also more

neurologically vulnerable than adults to the addictive aspects of Instagram, such as the peer

approval that comes from amassing follows and likes.  That is so because, during adolescence,

dopamine levels are at a functional high, leading to elevated patterns of exploration and novelty-

seeking, which serve to increase usage on Instagram.

155.     Defendants owe a particularly heightened duty of care to pre-teen users (those under

the age of 13), whose personal information is accorded special protection under federal law.  *See* 15

U.S.C. § 6501 *et seq.*

156.     Defendants failed to use reasonable care in designing Instagram.  At all times

relevant to the matters at issue in this Complaint, they knew or should have known that usage of

Instagram by minors could lead to addiction and, in turn, serious health consequences like depressive symptoms, social anxiety and isolation, body image concerns, self-harm, decreased self-esteem, developmental and educational deficits, and suicidality.  They also knew or should have known that these harms are even more severe for pre-teen users (those under the age of 13), whose brains are even less fully developed.

157.    Defendants easily could have, but to this day have failed to, implement safety measures to mitigate the addictive attributes and resulting harm that their product causes minors.  In addition, Defendants easily could have, but to this day have failed to, implement safety measures to prevent pre-teens from accessing their product.

158.    As a direct and proximate result of Defendants' breached duties, Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

159.    Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements, conceal their internal findings, fail to warn minors and their parents, and delay implementation of feasible product safety features.  Defendants' decision to prioritize profits over children's safety and health is outrageous and justifies an award of exemplary damages pursuant to California Code § 3294, in such a sum that will serve to deter Defendants and other social media companies from similar conduct in the future.

**COUNT IV: Negligence (Failure to Warn)**

**(Against All Defendants)**

160.    Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth herein.

161.    Defendants are responsible for the design, manufacture, and marketing of Instagram. Instagram is a product.

162.    Defendants knew or reasonably should have known that Instagram can be dangerous to pre-teen and teenage users, when used in its intended or reasonably foreseeable manner. Defendants also knew or reasonably should have known that ordinary users of Instagram, including children and teenagers, would not have appreciated these dangers.

163.    Defendants owed a duty to warn minor users and their parents of risks that are not obvious, but that Defendants knew or should have known to be present. Defendants breached their duty by failing to warn users of the safety risks presented by Instagram.  They have not posted, and to this day still do not post, any warnings that minors' use of Instagram can lead to serious harms. They do not post or display any warnings that the Instagram product ingests and analyzes user data with the goal of making itself progressively more addictive to the user.  They fail to provide any such warnings to parents or guardians when their children become users of Instagram.

164.    A reasonable technology company in Defendants' position would have warned its minor users and their parents of Instagram's safety risks.

165.    As a direct and proximate result of Defendants' negligence, Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

166.    Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing

- 42 -

COMPLAINT

scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements, conceal their internal findings, fail to warn minors and their parents, and delay implementation of feasible product safety features.  Defendants' decision to prioritize profits over children's safety and health is outrageous and justifies an award of exemplary damages pursuant to California Code § 3294, in such a sum that will serve to deter Defendants and other social media companies from similar conduct in the future.

**COUNT V: Negligence (Infliction of Emotional Distress)**

**(Against All Defendants)**

167.    Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth herein.

168.    Defendants have owed a duty to exercise reasonable care and caution for the safety of children using the Instagram product, including Plaintiff.  Defendants breached their duty to exercise reasonable care through their negligent design of Instagram and their failure to warn Plaintiff of any attendant safety risks from usage of Instagram.

169.    As a direct and proximate result of Defendants' negligence, Plaintiff suffered serious emotional distress.  Specifically, Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

170.    Defendants are further liable to Plaintiff for punitive damages based upon their extreme departure from the ordinary standard of conduct and their reckless disregard for the well-being of minor users.  Defendants' actions are morally blameworthy, given their failure to change Instagram to avoid harm to Plaintiff despite their internal research demonstrating the harms

associated with pre-teen and teenage use of Instagram.  Punitive damages should be awarded to prevent future harm from Defendants' negligence.

171.     Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements, conceal their internal findings, fail to warn minors and their parents, and delay implementation of feasible product safety features.  Defendants' decision to prioritize profits over children's safety and health is outrageous and justifies an award of exemplary damages pursuant to California Code § 3294, in such a sum that will serve to deter Defendants and other social media companies from similar conduct in the future.

## COUNT VI: Concealment

### (Against All Defendants)

172.     Plaintiff restates each of the allegations in the preceding paragraphs as if fully set forth herein.

173.     Defendants failed to disclose the serious safety risks presented by Instagram to its minor users and their parents, including Plaintiff.  Even though Defendants knew of those risks based on their internal studies, Defendants intentionally concealed those findings, in order not to lose users and advertising revenue, and in order to induce teenagers including Plaintiff to continue using Instagram.  Worse still, Defendants made numerous partial representations downplaying any potential harm associated with the Instagram product and reassuring the public and parents its products were safe.

174.     Plaintiff was not aware and could not have been aware of the facts that Defendants concealed.  As a result, Plaintiff sustained significant injury. Specifically, Plaintiff suffered from serious eating disorders and related mental health problems, resulting in over a year of

nonconsecutive in-patient or residential treatment, additional weeks of outpatient treatment, and ongoing therapy and counseling.

175.    Had Defendants warned Plaintiff about the safety risks posed by Instagram, Plaintiff would have been able to ascertain the source of her mental health issues at an earlier point in time, seek appropriate treatment, and attempt to break her addiction to Instagram by discontinuing or substantially reducing her use of the product.

176.    As a direct and proximate result of Defendants' concealment, Plaintiff developed and continues to suffer from suicidal ideation, generalized anxiety disorder, major depressive disorder, anorexia, and related mental health problems. This has resulted in years of in-patient and residential treatment, medication, ongoing therapy and counseling, and permanent disfiguring physical scars.

177.    Defendants' conduct was carried on with a willful and conscious disregard of the safety of Plaintiff and other minor users of Instagram.  Defendants knew and, based on the existing scientific and medical literature, should have known about the risks to minors associated with Instagram.  Yet they chose to ignore those risks, downplay any safety issues in public statements, conceal their internal findings, fail to warn minors and their parents, and delay implementation of feasible product safety features.  Defendants' decision to prioritize profits over children's safety and health is outrageous and justifies an award of exemplary damages pursuant to California Code § 3294, in such a sum that will serve to deter Defendants and other social media companies from similar conduct in the future.

**DEMAND FOR JURY TRIAL**

178.    Plaintiff hereby demands a trial by jury.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

A.  Enter judgment for Plaintiff and against Defendants on all counts;

B.  Enter an order that Defendants are jointly and severally liable;

C.  Award Plaintiff actual and compensatory damages to compensate Plaintiff for injuries sustained as a result of her use of the Instagram product, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations, medical treatment, therapy, and counseling, and other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

D.  Award exemplary and/or punitive damages;

E.  Award reasonable attorneys' fees;

F.  Award costs of litigation;

G.  Award pre-judgment and post-judgment interest at the lawful rate;

H.  Award any other relief as this court may deem equitable and just.

DATED: August 4, 2022

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK LLP**

James M. Wagstaffe (95535)
Frank Busch (258288)
100 Pine Street, Suite 2250
San Francisco, CA 94111
Tel: 415-357-8900
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

**MOTLEY RICE LLC**

Previn Warren*
401 9th Street NW Suite 630
Washington DC 20004
Tel: 202-386-9610
pwarren@motleyrice.com

Jonathan D. Orent*
Katie Menard*
55 Cedar Street
Providence, RI 02903
Tel: 401-457-7723
jorent@motleyrice.com
kmenard@motleyrice.com

Jodi Westbrook Flowers*
Jade Haileselassie*
Andrew Arnold*
P. Graham Maiden*
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Tel: 843-216-9163
jflowers@motleyrice.com

jhaileselassie@motleyrice.com
aarnold@motleyrice.com
gmaiden@motleyrice.com

Mathew P. Jasinski*
Jessica C. Colombo*
20 Church Street
Hartford, CT 06103
Tel: 860-218-2725
mjasinksi@motleyrice.com
jcolombo@motleyrice.com

*PRO HAC VICE APPLICATIONS TO
BE FILED